IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMEEL SHABAZZ and ALFRED TORRES, Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>MORGAN FUNDING CORP., DANIEL MACKLE, DANIEL LOUIS and FRANK CARDIA,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 07 CV 126 (VM)<br>)<br>) ECF CASE<br>)<br>)<br>)<br>)<br>) |

## ORDER

The Clerk of the Court is directed to substitute the attached document for Docket No. 94-15 in this action.

Dated: 22nd day of December, 2009

BY THE COURT:

_____
Victor Marrero U.S.D.J.

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12-23-09
```

# EXHIBIT M

Page 1

```
 1
 2  UNITED STATES DISTRICT COURT
 3  SOUTHERN DISTRICT OF NEW YORK
 4  Case No. 07 CV 126 (GEL) ECF Case
 5  - - - - - - - - - - - - - - - - - - -x
 6  JAMEEL SHABAZZ and ALFRED TORRES,
    Individually, and on Behalf of All Others
 7  Similarly Situated,
 8                  Plaintiffs,
 9          -against-
10  MORGAN FUNDING CORP., DANIEL MACKLE,
    DANIEL LOUIS and FRANK CARDIA,
11
                    Defendants.
12
    - - - - - - - - - - - - - - - - - - -x
13
                500 Fifth Avenue
14              New York, New York
15              August 13, 2009
                11:16 a.m.
16
17
18          DEPOSITION of DANIEL MACKLE, one
19  of the Defendants in the above-entitled
20  action, held at the above time and place,
21  taken before Barbara P. Goldsmith, a
22  Shorthand Reporter and Notary Public of
23  the State of New York, pursuant to the
24  Federal Rules of Civil Procedure, and
25  stipulations between Counsel.
```

Page 2

```
 1
 2  APPEARANCES:
 3
        ERIK H. LANGELAND, P.C.
 4      Attorney for Plaintiffs
            500 Fifth Avenue
 5          Suite 1610
            New York, New York 10110
 6
 7
        LAWRENCE R. GELBER, ESQ.
 8      Attorney for Defendants
            The Vanderbilt Plaza
 9          34 Plaza Street
            Suite 1107
10          Brooklyn, New York 11238
11
12  Present:
13  ADAM LEE, Videographer
14  TALIA HARARI
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2              STIPULATIONS
 3      IT IS HEREBY STIPULATED AND AGREED, by
 4  and among counsel for the respective
 5  parties hereto, that the filing, sealing
 6  and certification of the within deposition
 7  shall be and the same are hereby waived;
 8      IT IS FURTHER STIPULATED AND AGREED
 9  that all objections, except as to form of
10  the question, shall be reserved to the
11  time of the trial;
12      IT IS FURTHER STIPULATED AND AGREED
13  that the within deposition may be signed
14  before any Notary Public with the same
15  force and effect as if signed and sworn to
16  before the Court.
17
```

Page 4

```
 1
 2          THE VIDEOGRAPHER:  Good morning.
 3  My name is Adam Lee of Veritext New
 4  York.  The date today is August 13,
 5  2009 and the time is approximately
 6  11:16 a.m.  This deposition is being
 7  held in the office of Erik H.
 8  Langeland, P.C., located at 500 Fifth
 9  Avenue, Suite 1610, New York, New York
10  10110.
11      The caption of this case is
12  Jameel Shabazz versus Morgan Funding
13  Corp., et al in the United States
14  District Court for the Southern
15  District of New York, Case No. 07 CV
16  126 (GEL).  The name of the witness is
17  Daniel Mackle.
18      At this time the attorneys will
19  identify themselves and the parties
20  they represent, after which our court
21  reporter, Barbara Goldsmith, of
22  Veritext will swear in the witness and
23  we can proceed.
24          MR. LANGELAND:  Erik Langeland
25  for the plaintiffs.  Along with me is
```

Page 5

1      DANIEL MACKLE
2  Talia Harari.
3      MR. GELBER: Lawrence Gelber for
4  defendants.
5      We have an objection to the
6  videotaping of this deposition and I
7  would like an opportunity to voir dire
8  the witness before we proceed.
9      MR. LANGELAND: Okay.
10 D A N I E L   M A C K L E,
11     having been first duly sworn by a
12     Notary Public of the State of New
13     York, upon being examined, testified
14     as follows:
15 VOIR DIRE EXAMINATION
16 BY MR. GELBER:
17  Q.  Mr. Mackle, are you suffering
18 from -- to the best of your knowledge, are
19 you suffering from any type of fatal
20 disease?
21  A.  No.
22  Q.  Are you planning to leave the
23 country, to move out of the country within
24 the next 12 months?
25  A.  No.

Page 6

1      DANIEL MACKLE
2  Q.  Is there any event that you are
3  aware of, either by virtue of health,
4  intention to relocate, or any other event
5  that you can think of that would prevent
6  you from appearing at trial as a witness
7  in this case?
8  A.  No.
9      MR. GELBER: We maintain our
10     objection to the videotaping. It's
11     unnecessary. It's designed probably
12     to run up your expenses and certainly
13     to intimidate, but we will proceed.
14     MR. LANGELAND: The deposition
15     was by notice and it noticed that we
16     can take a videotape and we're
17     proceeding under the rules.
18 EXAMINATION BY
19 MR. LANGELAND:
20  Q.  Good morning, Mr. Mackle.
21  A.  Good morning.
22  Q.  Have you ever been deposed
23 before?
24  A.  Yes.
25  Q.  When?

Page 7

1      DANIEL MACKLE
2  A.  A couple of months ago.
3  Q.  In what case?
4  A.  I have some cases but -- against
5  Morgan Funding.
6  Q.  Okay. And are these cases based
7  on the Truth and Lending Act?
8  A.  Yes.
9  Q.  Okay. Are they all -- is it all
10 one case or are there multiple cases?
11  A.  Multiple cases.
12  Q.  Okay. Is it the same law firm
13 that's bringing the cases against?
14  A.  Yes.
15  Q.  And are you being sued
16 individually?
17  A.  Yes.
18  Q.  And you're being sued as Morgan
19 Funding as well?
20  A.  Yes.
21  Q.  Is Mr. Cardia being sued, to
22 your knowledge, in any of those cases?
23  A.  No.
24  Q.  And is Mr. Louis being sued in
25 any of those cases?

Page 8

1      DANIEL MACKLE
2  A.  Yes.
3  Q.  And is Mr. Colletta being sued
4  in any of those cases?
5  A.  No.
6  Q.  Is anybody else being sued who
7  is an owner of Morgan Funding?
8  A.  No.
9  Q.  Okay. And the deposition that
10 you've had -- I'm sorry -- was it just one
11 deposition?
12  A.  Yes.
13  Q.  And when did you say it was?
14  A.  A couple of months ago.
15  Q.  Where did it take place?
16  A.  Somewhere South Jersey.
17  Q.  Do you know what the case
18 caption is or what the case is against
19 you, who the plaintiff is?
20  A.  There's eight separate cases. I
21 don't, off the top of my head, no, I
22 don't.
23  Q.  Eight separate cases. Okay.
24 And was the deposition for the purpose of
25 responding to each of the eight cases or

Page 9

1  DANIEL MACKLE
2  will there be eight depositions; do you
3  know?
4  A. No, I believe that was the only
5  one.
6  Q. Okay. What is your
7  understanding of your oath?
8  A. I don't understand the question.
9  Q. Okay. You gave an oath just now
10 to the court reporter, didn't you?
11 A. Yes.
12 Q. Okay. What's your understanding
13 of what that means?
14      MR. GELBER: We're going to just
15 object to the question. You can
16 answer.
17 A. To tell the truth.
18 Q. Okay. And if I ask you a
19 question and you don't understand, will
20 you ask me to rephrase it and I'll do
21 that?
22 A. Yes.
23 Q. Okay. If I'm asking you a
24 question, will you just let me finish the
25 question and then you can answer it?

Page 10

1  DANIEL MACKLE
2  A. Sure.
3  Q. Great. And you have to give
4  your answers in words, not, you know, nods
5  of your head or uh-huhs so the court
6  reporter can take it down. Can you do
7  that?
8  A. Sure.
9  Q. Great. Okay. Did you do
10 anything to prepare for today's
11 deposition?
12 A. Not particularly.
13 Q. Did you meet with your lawyer?
14 A. No.
15 Q. Okay. Did you review any
16 documents?
17 A. No.
18 Q. What is your current address?
19 A. 3204 High View Way, Pomona, New
20 York 10970.
21 Q. And do you own that?
22 A. No.
23 Q. You're renting?
24 A. Yes.
25 Q. Do you own a house in Pomona?

Page 11

1  DANIEL MACKLE
2  A. Yes.
3  Q. What's that house?
4  A. 23 Carteret Drive, Pomona, New
5  York 10970.
6  Q. Is that right across the street
7  from Dan Louis?
8  A. Yes.
9  Q. Okay. He still owns that house
10 across the street?
11 A. As far as I know.
12 Q. Do you own any other houses?
13 A. Yes.
14 Q. Where?
15 A. Hicksville, Long Island.
16 Q. What's the address?
17 A. 62 East End Avenue.
18 Q. Do you have any other real
19 estate?
20 A. No.
21 Q. Do you have an interest in any
22 other real estate?
23 A. No.
24 Q. Have you ever purchased any real
25 estate in Hoboken, New Jersey?

Page 12

1  DANIEL MACKLE
2  A. No.
3  Q. What's your phone number?
4  A. (201) 240-4754.
5  Q. Is that a cell phone?
6  A. Yes.
7  Q. Who's the carrier?
8  A. Verizon.
9  Q. How long have you had that
10 number?
11 A. Ten years, maybe longer.
12 Q. Has Verizon always been the
13 carrier?
14 A. No.
15 Q. You've had different carriers?
16 A. Yes.
17 Q. What other carriers have you
18 had?
19 A. I don't recall. I've had
20 Verizon for quite a while.
21 Q. How long?
22 A. A few years.
23 Q. What's your Social Security
24 number?
25 A. **REDACTED**

Page 13

1     DANIEL MACKLE
2  Q. And do you have an e-mail
3  address?
4  A. Dmackle@aol.
5  Q. How long have you had
6  dmackle@aol.com?
7  A. Probably 15 years.
8  Q. Still have access to the e-mails
9  on that account?
10 A. I think they keep them for 60
11 days or something.
12 Q. Did you receive e-mails from
13 Morgan Funding or related to Morgan
14 Funding at that account?
15 A. Probably not.
16 Q. Why?
17    MR. GELBER: I object to the
18 question. You're asking him why other
19 people chose not to send e-mails to
20 him at a particular -- you're asking
21 him to opine to what's in the mind of
22 somebody who would send an e-mail. I
23 mean --
24    MR. LANGELAND: Okay.
25 Q. Do you understand my question?

Page 14

1     DANIEL MACKLE
2  A. I don't know. I don't know why
3  they didn't. I guess they didn't have
4  that e-mail address.
5  Q. Okay. Do you have another
6  e-mail address?
7     MR. GELBER: Don't guess, by the
8  way, don't guess about anything.
9  A. Yes.
10 Q. What was your other e-mail
11 address?
12 A. Dmackle@morganfundingcorp.com.
13 Q. And that's where you primarily
14 received e-mails relating to Morgan
15 Funding?
16 A. Yes.
17 Q. Okay. How long did you have
18 that e-mail address?
19 A. Probably eight or nine years.
20 Q. Do you still have it?
21 A. Yes.
22 Q. Do you have any other e-mail
23 addresses?
24 A. Dmackle@pendulummarkets.com.
25 Q. Do you have any other e-mail

Page 15

1     DANIEL MACKLE
2  address?
3  A. No.
4  Q. Is dmackle@pendulummarkets.com
5  still active?
6  A. Yes.
7  Q. How long have you had that
8  e-mail address?
9  A. Probably two or three years.
10 Q. Do you have a service that keeps
11 your e-mails or provides your e-mails to
12 you?
13    MR. GELBER: I don't understand
14 the question.
15    MR. LANGELAND: Let me see if I
16 can rephrase it. That was a bad
17 question. I'll withdraw that question
18 and I'll see if I can rephrase it.
19 Q. Do you have like an exchange
20 server?
21 A. I don't think so, no. I don't
22 know a lot about that, though.
23 Q. Okay. Do you know if your
24 e-mails are directly on your computer or
25 are they at some off site location?

Page 16

1     DANIEL MACKLE
2  A. I think it depends on the e-mail
3  address.
4  Q. Okay. And for Morgan Funding,
5  was it an off site location?
6  A. No.
7  Q. It was on the computer?
8  A. Correct.
9  Q. And for
10 dmackle@pendulummarkets.com, was that an
11 off site location?
12 A. I believe those are all
13 captured, yes.
14 Q. Okay. And for dmackle@aol.com?
15 A. I don't know how AOL does. I
16 don't think they keep it off site.
17    MR. GELBER: Don't guess.
18 A. I don't know.
19 Q. Okay. You don't know. All
20 right. How do you know that the e-mails
21 were stored on the computer at Morgan
22 Funding?
23 A. They just were. They were
24 downloaded onto the computer.
25 Q. Okay. By that do you mean that

Page 17

```
 1              DANIEL MACKLE
 2   they were downloaded on your individual
 3   computer or were they on a server?
 4      A.  I'm not sure.
 5      Q.  You had a server there, though,
 6   right?
 7      A.  I don't know.  I don't know if
 8   we had an e-mail server.
 9      Q.  Did you have a computer room?
10      A.  Yes.
11      Q.  And did you have a computer
12   network at Morgan Funding?
13      A.  Yes.
14      Q.  Okay.  Could you access, you
15   know, try to centralize documents or
16   common documents through your office
17   computer?
18      A.  Like what kind of documents?
19      Q.  Were there documents that were
20   kind of for everybody's use or maybe for
21   the executives' use at Morgan Funding?
22      A.  No.
23      Q.  No documents that you guys would
24   fill out?
25      A.  We had a point data server which
```

Page 18

```
 1              DANIEL MACKLE
 2   I guess all the -- anyone could access it,
 3   or the processors anyway.
 4      Q.  What's a point data server?
 5      A.  It's the server, it's the loan
 6   origination software at that point.
 7      Q.  Calyx Point?
 8      A.  Calyx Point.
 9      Q.  Okay.  So you had that and you
10   could access data on Calyx Point?
11      A.  I couldn't.  I never -- I didn't
12   have it on my computer.
13      Q.  What is -- where do you work
14   right now?
15      A.  Pendulum Capital.
16      Q.  And where is that located?
17      A.  411 Hackensack Avenue,
18   Hackensack, New Jersey 07601.
19      Q.  And is there a room number or
20   floor number?
21      A.  Fifth floor.
22      Q.  Fifth floor.  Do you have the
23   whole fifth floor?
24      A.  No.
25      Q.  You have an office on the fifth
```

Page 19

```
 1              DANIEL MACKLE
 2   floor?
 3      A.  Yes.
 4      Q.  Okay.  And Mr. Cardia testified
 5   that he also had an office at 411
 6   Hackensack Avenue.  Was that in your
 7   office?
 8      A.  No.
 9      Q.  Was it next to your office?
10      A.  Yes.
11      Q.  Okay.  And how did you
12   distinguish, was one a particular suite
13   number or it just says, yours says
14   Pendulum Capital and theirs says something
15   else?
16      A.  Yeah, there's no suite numbers.
17      Q.  Okay.  Is there a sign on your
18   door?
19      A.  Yes.
20      Q.  And what does it say?
21      A.  Pendulum Capital Markets.
22      Q.  And does it say anything else?
23      A.  Yes, member -- I'm not 100
24   percent sure -- member of FINRA, whatever,
25   something like that.
```

Page 20

```
 1              DANIEL MACKLE
 2      Q.  Okay.  Are there any other
 3   business names on the door that you --
 4      A.  It probably says Securities
 5   Institute Through Garden State Securities.
 6      Q.  Anything else?
 7      A.  No.
 8      Q.  Okay.  And what did the office
 9   say that Cardia was in; do you know what
10   the sign says?
11      A.  I don't remember.
12      Q.  Was it National Future Mortgage?
13      A.  It's possible.  I'm not sure.
14      Q.  You don't know what they were
15   doing?
16          MR. GELBER:  What who was doing?
17      When you say they?
18          MR. LANGELAND:  Okay.  Let me
19      rephrase it.
20      Q.  Do you know what Cardia was
21   doing?
22          MR. GELBER:  When?
23      Q.  When he worked at the 411
24   Hackensack address.
25      A.  I assume he was doing well.
```

Page 21

```
 1         DANIEL MACKLE
 2     MR. GELBER: Don't guess.
 3  A.  I don't know. I guess
 4  mortgages.
 5     MR. GELBER: Don't guess.
 6     THE WITNESS: Okay.
 7  Q.  You never talked to him about
 8  what he was doing?
 9  A.  It was just known that he was
10  doing mortgages. It wasn't -- he didn't
11  need to clarify it to me.
12  Q.  Okay. Do you know who he worked
13  for?
14  A.  Probably National Future.
15  Q.  Was he working for you at that
16  time?
17  A.  No.
18  Q.  Not at all?
19  A.  No.
20  Q.  Was he working for any company
21  that was owned in part or in full by you?
22  A.  No.
23  Q.  Have you ever been arrested?
24  A.  No.
25  Q.  Have you ever -- we've already
```

Page 22

```
 1         DANIEL MACKLE
 2  covered this. Other than those TALA
 3  lawsuits, have you been sued?
 4  A.  No.
 5     MR. GELBER: Hold on. This
 6  is -- you're in a divorce.
 7     THE WITNESS: I sued her.
 8     MR. GELBER: Oh, okay. Sorry.
 9  All right.
10     THE WITNESS: That's why I
11  hesitated for a second.
12     MR. GELBER: Sorry about that.
13  We just didn't want to have an
14  incorrect record.
15  Q.  So other than the TALA case and
16  the divorce where you sued, you're not
17  being sued, are you involved in any other
18  legal proceedings?
19  A.  Not other than this one. Those
20  and this one.
21  Q.  Okay. Have you been contacted
22  by any law enforcement regarding Morgan
23  Funding?
24  A.  No.
25  Q.  Have you spoken to any former
```

Page 23

```
 1         DANIEL MACKLE
 2  Morgan Funding employees about this case?
 3  A.  No.
 4  Q.  Not at all?
 5  A.  No.
 6  Q.  You haven't had any
 7  conversations with Cardia or Louis or --
 8     MR. GELBER: Can you clarify
 9  when you say about this case?
10     MR. LANGELAND: About this case
11  in any way.
12  A.  Well, I spoke -- yeah, I spoke
13  to Dan Louis and Frank Cardia about it.
14  Q.  Okay. First of all, with Dan
15  Louis, when was that conversation?
16  A.  I don't know offhand.
17  Q.  Okay. How many conversations
18  have you had with him about the case?
19  A.  Maybe two.
20  Q.  Okay. And what was said in each
21  of the conversations?
22     MR. GELBER: First of all,
23  they're both defendants and so you're
24  impinging on joint defense privileges.
25     MR. LANGELAND: Okay. Let me
```

Page 24

```
 1         DANIEL MACKLE
 2  ask --
 3     MR. GELBER: So I have a problem
 4  with you asking him about the content
 5  of conversations with any named
 6  defendant, specifically Dan Louis and
 7  Frank Cardia.
 8  Q.  Well, was any lawyer present
 9  during your conversation?
10  A.  No.
11     MR. LANGELAND: I don't think
12  you have anything there.
13     MR. GELBER: I don't know if I
14  do or I don't. I think I do. I think
15  two defendants in a case probably have
16  an extrication. Pursue it. I'm not
17  instructing him.
18     MR. LANGELAND: You're not
19  instructing him.
20     MR. GELBER: I'm not instructing
21  him.
22  Q.  What did you say to Mr. Louis
23  and what did Mr. Louis say to you?
24  A.  Well, I just told him I was
25  coming in for a deposition.
```

Page 25

1   DANIEL MACKLE
2   Q. When was that?
3   A. Again, I'm not sure.
4   Q. That was a recent conversation,
5   though?
6   A. Yeah.
7   Q. Okay. And what about the first
8   conversation?
9   A. I don't remember specific
10  conversations.
11  Q. Okay. But you testified that
12  you had maybe two conversations with him?
13  A. Uh-huh.
14  Q. Okay. And you don't remember
15  what the other conversation was?
16  A. No.
17  Q. Okay. And what about Frank
18  Cardia?
19  A. The same. I just told him I was
20  coming in for a deposition.
21  Q. Okay. Did you speak with Craig
22  Colletta about this case?
23  A. Yes.
24  Q. Okay. What did you say?
25  A. Same, I told him I was coming in

Page 26

1   DANIEL MACKLE
2   for a deposition.
3   Q. Okay. Nothing else?
4   A. No.
5   Q. Okay. When you -- when did you
6   first learn about this case?
7   A. It's been a couple of years at
8   least.
9   Q. Okay. And you didn't have any
10  conversations at that time with any of
11  the -- any former employees of Morgan
12  Funding?
13  A. I don't recall.
14  Q. When did you leave Morgan
15  Funding?
16  A. The end of 2007.
17  Q. Okay. Do you remember the date?
18  A. No.
19  Q. And when did you start Morgan
20  Funding?
21  A. Somewhere around 2000.
22  Q. Why did you leave?
23  A. The company went out of
24  business.
25  Q. Okay. So you shut down the

Page 27

1   DANIEL MACKLE
2   company?
3   A. No. The corporation is still --
4   is not shut down.
5   Q. The corporation still exists.
6   Okay. But you ceased operating; is
7   that --
8   A. Correct.
9   Q. Okay. And who made that
10  decision?
11  A. I did.
12  Q. Why?
13  A. I couldn't pay the bills
14  anymore.
15  Q. Okay. And did you send out a
16  notice to people that were working for
17  Morgan Funding at that time?
18  A. No.
19  Q. How did you let them know?
20  A. I just told them.
21  Q. You had a meeting?
22  A. I don't think I had a meeting
23  with the employees. I just told them, you
24  know, probably Dan and Frank.
25  Q. What about Craig Colletta, did

Page 28

1   DANIEL MACKLE
2   you tell him?
3   A. At some point.
4   Q. Do you know when?
5   A. No.
6   Q. Where did you go to high school?
7   A. Queens.
8   Q. What was the high school name?
9   A. St. Francis Prep.
10  Q. Did you go to college?
11  A. Yes.
12  Q. Where?
13  A. Manhattanville College.
14  Q. Okay. Did you graduate?
15  A. Yes.
16  Q. When?
17  A. '91.
18  Q. Okay. What was your degree in?
19  A. Business administration.
20  Q. Have you done any graduate
21  school?
22  A. No.
23  Q. Have you passed any professional
24  examinations?
25  A. Yes.

Page 29

1     DANIEL MACKLE
2  Q.  Okay.
3      Which ones?
4  A.  Series 7, 63, 4, 24, 55, 65.
5  Q.  These all relate to the
6  financial industry?
7  A.  Correct. I also graduated from
8  the Mortgage Bankers Association School of
9  Mortgage Banking.
10 Q.  Where is that?
11 A.  Washington, D.C.
12 Q.  Washington, D.C.?
13 A.  Yes.
14 Q.  Thank you.
15 A.  It's not an curriculum like a
16 college that you go to, but you take
17 classes and what not.
18 Q.  Do you get a degree or anything
19 when you graduate?
20 A.  They gave me a little
21 certificate.
22 Q.  Okay. What does it say?
23 A.  Accredited mortgage
24 professional.
25 Q.  Okay. All right. And when did

Page 30

1     DANIEL MACKLE
2  you graduate from there?
3  A.  Probably three or four years
4  ago.
5  Q.  Not before you started at Morgan
6  Funding?
7  A.  No.
8  Q.  Okay. Do you have any licenses,
9  professional licenses?
10 A.  Those would probably be the
11 numbers I gave you would be licenses.
12 Q.  Anything else?
13 A.  No.
14 Q.  Do you have any licenses for --
15 as a mortgage solicitor?
16 A.  I did. I don't anymore.
17 Q.  Okay. You gave it up?
18 A.  Yeah.
19 Q.  Did you resign or did they take
20 some action against you?
21 A.  No. I turned it in.
22 Q.  Okay. When was that?
23 A.  Sometime around the time that I
24 closed the company or I stopped doing
25 business.

Page 31

1     DANIEL MACKLE
2  Q.  Okay. And that was just for New
3  Jersey, is that correct, or were there
4  other mortgage solicitor licenses that you
5  had from other states?
6  A.  Other states had it also.
7  Q.  Do you remember what states you
8  were licensed in?
9  A.  Florida, New York, Connecticut,
10 Massachusetts, Pennsylvania, Nevada,
11 California. I believe that's all the
12 states.
13 Q.  Okay. Did Morgan Funding have
14 offices in any of these states?
15 A.  We had an office in
16 Pennsylvania, Nevada, New York. I believe
17 that was it.
18     MR. GELBER: New Jersey.
19 A.  Oh, New Jersey.
20     MR. GELBER: Sorry about that,
21 but sometimes you omit the obvious. I
22 just wanted to.
23     MR. LANGELAND: Right, right.
24 Okay, good.
25 Q.  Did you have one in Florida?

Page 32

1     DANIEL MACKLE
2  A.  For a small point in time we
3  did, that's right.
4  Q.  Nothing in Connecticut?
5  A.  No.
6  Q.  Or Massachusetts?
7  A.  No.
8  Q.  And nothing in California?
9  A.  No.
10 Q.  Okay. Did you take any classes
11 in law?
12 A.  No.
13 Q.  Okay. Where did you work before
14 you worked at Morgan Funding?
15 A.  Barron Chase Securities.
16 Q.  Okay. Where was your office?
17 A.  777 Terrace Avenue, Hasbrouck
18 Heights, New Jersey.
19 Q.  What were your dates of
20 employment there?
21 A.  Roughly '97 to 2000.
22 Q.  Why did you leave?
23 A.  The company went out of
24 business.
25 Q.  Did you have a branch?

Page 33

1    DANIEL MACKLE
2    A.  Yes.
3    Q.  Okay. And did the branch go out
4  of business or Barron Chase went out of
5  business altogether?
6    A.  Barron Chase went out of
7  business altogether.
8    Q.  Okay. So you, in essence, had
9  to close your branch?
10   A.  Correct.
11   Q.  Thank you. And then you started
12  Morgan Funding; is that right?
13   A.  We probably had started it
14  already.
15   Q.  You had already started it.
16  Okay. And did you also start Pendulum
17  Capital Markets or was that already
18  started?
19   A.  No, I started that after Barron
20  Chase went out of business.
21   Q.  Okay. When did Morgan Funding
22  start, to the best of your knowledge?
23   A.  Somewhere around 2000.
24   Q.  Okay.
25        MR. GELBER: Asked and answered,

Page 34

1    DANIEL MACKLE
2  by the way.
3    Q.  And how did Morgan Funding
4  start?
5    A.  I don't understand the question.
6    Q.  Did you found it?
7    A.  Yes.
8    Q.  And you incorporated it?
9    A.  Yes.
10   Q.  How did it come to be decided,
11  okay, I'm going to start a mortgage
12  company?
13   A.  I saw an ad in Entrepreneur
14  magazine for the loan consultants and I
15  called them and they did training and
16  everything. Walked us through the ropes.
17   Q.  Okay. So you learned how to
18  become a loan officer?
19   A.  Correct, and how to open a
20  company.
21   Q.  Okay. And where did you
22  incorporate Morgan Funding?
23   A.  I believe New Jersey.
24   Q.  What was the incorporation? I
25  mean, what kind of corporation is it; is

Page 35

1    DANIEL MACKLE
2  it an S corporation?
3    A.  Yeah, S Corp.
4    Q.  S Corp. And who are the
5  shareholders?
6    A.  Myself, Craig Colletta, Deborah
7  Louis and Sharon Cardia.
8    Q.  And are you equal shareholders?
9    A.  Yes.
10   Q.  Okay. How did it come that you
11  decided to partner with these four people?
12   A.  I don't recall.
13   Q.  You had known them for a while?
14   A.  Yes.
15   Q.  I'm sorry. What is Mrs. Louis'
16  name?
17   A.  Deborah.
18   Q.  Deborah. Now, Frank Cardia and
19  Dan Louis used to work for you at Barron
20  Chase; is that right?
21   A.  Correct.
22   Q.  Okay. And they were the subject
23  of some kind of a disciplinary action?
24   A.  Yes.
25   Q.  What was that, to the best of

Page 36

1    DANIEL MACKLE
2  your knowledge?
3    A.  They had some issue with some
4  kind of opening accounts in states they
5  weren't licensed in or something along
6  those lines.
7    Q.  Okay. And were they then barred
8  from being --
9    A.  I believe --
10   Q.  A stockbroker?
11   A.  I believe so, yes.
12   Q.  Okay. Do you know if they had
13  fines levied against them?
14   A.  I don't know.
15   Q.  Well, as the branch owner,
16  wouldn't you have learned what the
17  allegations against them and the outcome
18  was?
19   A.  No, because they were already
20  gone from the firm by the time the outcome
21  happened.
22   Q.  I see. Did you fire them?
23   A.  No.
24   Q.  Did the firm close?
25   A.  I don't really recall the

Page 37

DANIEL MACKLE
1  timeline.
2  Q. Okay. So you don't know if they
3  quit or you fired them or if the firm just
4  closed?
5  A. I'm not sure.
6  Q. Okay. By the way, you're a
7  member of MENSA, are you?
8  A. No.
9  Q. You're not a member of MENSA.
10  A. Thank you for the compliment
11  though.
12       MR. GELBER: I was going to fall
13  off my chair.
14       THE WITNESS: Such a stretch?
15       MR. GELBER: No. All my clients
16  are members of MENSA.
17       MR. LANGELAND: Are you? No.
18       MR. GELBER: I'm not going to
19  discuss it.
20       MR. LANGELAND: Okay. Fair
21  enough.
22  Q. How did you agree to form the
23  company with the four people that you
24  agreed?

Page 38

DANIEL MACKLE
1
2  A. I don't know.
3  Q. I'm just wondering. How did it
4  come about that you chose them as -- let
5  me back up.
6       MR. GELBER: Yes, the question
7  was --
8  Q. Was it your idea to start the
9  mortgage company?
10  A. Yes.
11  Q. Okay. And then how did you pick
12  these other folks to join you?
13       MR. GELBER: Wait, hold on. I'm
14  going to object to the phrase, join
15  you. By other folks I assume you're
16  referring to the investors, right? Or
17  are you referring to the people who
18  were going to work with him? It's a
19  little ambiguous there.
20       MR. LANGELAND: You're right.
21       MR. GELBER: Or a lot ambiguous.
22  Q. You have equal shareholders with
23  you in the S corp. for Morgan Funding,
24  right?
25  A. Correct.

Page 39

DANIEL MACKLE
1
2  Q. And at some point you had
3  decided to incorporate and you decided who
4  the shareholders would be?
5  A. Yes.
6  Q. Okay. How would you decide that
7  you would work it out this way?
8  A. You know, I'm not sure. It was
9  a while ago.
10  Q. Did you have a meeting or
11  something, you sat around, went out for
12  dinner or something?
13  A. I don't recall.
14  Q. Why did you pick Deborah Louis
15  to be a shareholder instead of Dan Louis?
16       MR. GELBER: I'm going to object
17  to the question because it assumes a
18  fact not in evidence, when you say
19  pick. I have a problem with that.
20  Q. Can you answer the question?
21       MR. GELBER: A bunch of people
22  lined up and I choose you, you and
23  you?
24  A. I don't know if there is an
25  answer to this. It's just the way it was.

Page 40

DANIEL MACKLE
1
2  Q. It's just how it worked out?
3  Okay? But you were the one who -- were
4  you the one who actually went and got the
5  incorporation documents done?
6  A. Yes.
7  Q. Did you see a lawyer?
8  A. No. I think I did it online.
9  Q. Okay.
10  A. Cheaper.
11  Q. Do you have a vote or anything?
12  A. No.
13  Q. I mean corporate interests. No?
14  A. No.
15  Q. Was there an investment into the
16  business?
17  A. Yes.
18  Q. How much was the investment?
19  A. It had to be somewhere in the
20  ballpark of $50,000.
21  Q. So each of the investors, I mean
22  each of the shareholders invested $50,000?
23  A. No. It was $50,000 total.
24  Q. Okay. And each investor or each
25  put in equal share?

Page 41

1    DANIEL MACKLE
2    A.  I don't think so, no.
3    Q.  Who put in what?
4    A.  To the best of my recollection,
5  Craig and I put the $50,000 and Deborah
6  and Sharon came on as owners later on,
7  after the company was established.
8    Q.  I see.  So when you originally
9  incorporated, was it just you and Craig
10  Colletta; is that who were the
11  shareholders?
12    A.  I think so.
13    Q.  Okay.  Do you have documents,
14  for example, minutes of your meetings or
15  anything like that when you incorporated?
16    A.  I could look.  I'm not sure.
17    Q.  And what about, do you have --
18  did you receive stock certificates and did
19  you issue stock certificates?
20    A.  Probably not.
21    Q.  Okay.  And how did anybody know
22  how much they were entitled to?
23    A.  I mean, they were on the tax
24  returns as owners.
25    Q.  Okay.  And did it specify that

Page 42

1    DANIEL MACKLE
2  they were equal owners?
3    A.  I'm not sure.  I don't know how
4  the tax returns are.
5    Q.  Was there any document among you
6  that specified who, you know, who were the
7  owners or this is what our deal is?
8    A.  I don't think we ever done
9  anything.
10    Q.  You never wrote up some formal
11  document?
12    A.  I don't believe so.
13    Q.  Did you used to keep a meeting
14  minutes for the corporation or, you know,
15  the corporate documents?
16    A.  I believe we have yearly
17  meetings minutes.
18        MR. LANGELAND:  I'll mark the
19    record and call for the production of
20    those documents.
21        MR. GELBER:  We'll take it under
22    advisement.  I think it's irrelevant,
23    but --
24    Q.  While you were at Morgan
25  Funding, were you always the -- strike

Page 43

1    DANIEL MACKLE
2  that.  Let me go backwards.
3        What was your title at Morgan
4  Funding?
5    A.  CEO and president.
6    Q.  And did you hold any other
7  titles while you were there?
8    A.  I may have signed off on
9  secretary.  I'm not sure.  Maybe chairman,
10  too.
11    Q.  Okay.
12        MR. GELBER:  Grand poobah.
13        THE WITNESS:  That's why I'm
14    sitting here now.
15    Q.  Were you the -- you were the top
16  executive at Morgan Funding?
17    A.  Yes.
18    Q.  Okay.  And who reported to you?
19    A.  Really the managers.
20    Q.  Who were the managers?
21    A.  Dan and Frank ran the -- Dan
22  Louis and Frank Cardia ran the Jersey City
23  office.  We had Doug Geist and Gary Unger
24  ran the New Brunswick office.
25    Q.  Okay.

Page 44

1    DANIEL MACKLE
2    A.  We had a few different managers
3  in New York.  But predominantly Mike
4  Verdicchio managed there.
5    Q.  Okay.
6    A.  I'm trying to think of names.
7  Robert Andino ran, actually, the Las Vegas
8  office.
9    Q.  How many loan officers were in
10  Robert Andino's office?
11    A.  I'm not sure.  I don't -- it was
12  pretty short lived.  I don't think he had
13  too many.
14    Q.  Okay.  Were there other
15  managers?
16    A.  Yeah.  The names escape me.  I
17  think there was a few others.
18    Q.  Where did Craig Colletta fit in?
19    A.  He was a passive investor.
20    Q.  Did he have a role in the
21  company?
22    A.  Not really.
23    Q.  Did he have a title with the
24  company?
25    A.  I don't think so.

Page 45

1         DANIEL MACKLE
2    Q.   Did he have a Morgan Funding
3 e-mail address?
4    A.   I'm not sure.
5    Q.   Did he have any mailbox at
6 Morgan Funding?
7    A.   What do you mean by mailbox?
8         MR. GELBER: Yes.
9    Q.   Like, was there any place that
10 he received mail at Morgan Funding?
11   A.   No.
12   Q.   Was he -- did he have an office
13 at Morgan Funding?
14   A.   No.
15   Q.   Where was the office starting in
16 2000, was there an office for Morgan
17 Funding when you founded it?
18   A.   Yeah.
19   Q.   Where was it?
20   A.   26 Journal Square.
21   Q.   So once you incorporated it, you
22 got the office space?
23   A.   I don't know if it was right
24 away.
25   Q.   Okay. At some point after you

Page 46

1         DANIEL MACKLE
2 incorporated, you got the office space?
3    A.   I don't know if it was right
4 away.
5    Q.   Okay. At some point after you
6 incorporated. Okay. And where was the
7 office?
8    A.   26 Journal Square.
9    Q.   On the second floor?
10   A.   Correct.
11   Q.   Okay. And you had an office,
12 too, there?
13   A.   I did not, no.
14   Q.   Where was your office?
15   A.   I was still in Hasbrouck Heights
16 at 777 Terrace Avenue.
17   Q.   Okay. And at some point you
18 came over to Journal Square?
19   A.   Correct.
20   Q.   Okay. When was that?
21   A.   I'm not sure.
22   Q.   Okay. By the way, did Craig
23 Colletta work with you at Barron Chase?
24   A.   Yes.
25   Q.   And what was his position there?

Page 47

1         DANIEL MACKLE
2    A.   He was a broker, I suppose.
3    Q.   Okay. Did he have any ownership
4 interest in the branch that you had?
5    A.   Yes.
6    Q.   What was the ownership interest?
7    A.   50/50.
8    Q.   Okay. When you moved over to
9 the Journal Square office, did Colletta
10 also move over?
11   A.   No. He had actually left Barron
12 Chase already. He had started up another
13 company.
14   Q.   What company was that?
15   A.   I can't remember the name of it.
16 It was, like, an Internet company.
17   Q.   Okay. And you don't remember
18 the date that you got an office at 26
19 Journal Square. Do you remember where it
20 was?
21        MR. GELBER: Where 26 Journal
22 Square was?
23        MR. LANGELAND: Where his office
24 was in 26 Journal Square.
25        MR. GELBER: You mean on what

Page 48

1         DANIEL MACKLE
2 floor?
3         MR. LANGELAND: Yeah.
4    A.   It was on the second floor.
5         MR. GELBER: I'm sorry.
6    Q.   Was it in the same space that
7 Morgan Funding had?
8    A.   No.
9    Q.   It was next to it?
10   A.   Yes.
11   Q.   Okay. And did you have a sign
12 on the wall where your office was?
13   A.   Well, I had a J.P. Turner
14 office. When Barron Chase went out of
15 business, we went over to J.P. Turner,
16 another brokerage firm.
17   Q.   Okay. So, and was this a branch
18 office?
19   A.   Yes.
20   Q.   And was it your own branch?
21   A.   Yes.
22   Q.   And was it your own branch?
23   A.   Myself and Craig.
24   Q.   Was if 50/50 ownership, too?
25   A.   Yes.

Page 49

1    DANIEL MACKLE
2    Q.   Okay. So what you did was you
3    opened an office at the 26 Journal Square
4    location and that was a J.P. Turner
5    office?
6    A.   Correct.
7    Q.   Okay. And was it also a Morgan
8    Funding office, in other words, I guess
9    you conducted business for Morgan Funding
10   there?
11   A.   No. There was two separate
12   offices.
13   Q.   Okay. While you -- oh, okay.
14   While you were at the 26 Journal Square
15   location on the second floor, how long was
16   your office there?
17   A.   I'm not sure. A couple of
18   years.
19   Q.   A couple of years. And then did
20   Morgan Funding get bigger space?
21   A.   Yes.
22   Q.   Okay. And it was still in the
23   26 Journal Square office?
24   A.   Yes.
25   Q.   Okay. And what floor was it on?

Page 50

1    DANIEL MACKLE
2    A.   Ninth.
3    Q.   Okay. By the way, how big was
4    the second floor office of Morgan Funding?
5    A.   2,500 square feet maybe,
6    roughly.
7    Q.   And you had desks in there for
8    the loan officers?
9    A.   Yes.
10   Q.   How many desks?
11   A.   I'm not sure.
12   Q.   Was it more than 10?
13   A.   Probably right around there.
14   Q.   How many loan officers worked on
15   that second floor?
16   A.   I'm not sure.
17   Q.   Do you have a sense of whether,
18   you know, it was more than 10 loan
19   officers at any one time?
20   A.   I'm not sure.
21   Q.   Did you go into the second floor
22   office for Morgan Funding while you were
23   the CEO?
24   A.   Yes.
25   Q.   How often?

Page 51

1    DANIEL MACKLE
2    A.   Probably every day.
3    Q.   Okay. And do you remember
4    seeing loan officers in there?
5    A.   Do I remember seeing them? I
6    don't specifically remember seeing anyone,
7    no. I'm sure they were there, though.
8    Q.   Okay. Did each of the loan
9    officers get a phone?
10   A.   Yes.
11   Q.   Okay. And how many phones were
12   in that office?
13   A.   I'm not sure.
14   Q.   By the way, you have a phone
15   company, don't you?
16   A.   No.
17   Q.   Did you ever have an interest in
18   a phone company?
19   A.   No.
20       MR. GELBER: Hold on. You mean
21   like investing in AT&T?
22       MR. LANGELAND: Yeah, right.
23   Q.   Not an investment in AT&T or
24   something like that, but if you have an
25   ownership in some kind of a company that

Page 52

1    DANIEL MACKLE
2    provided phone service.
3    A.   No.
4    Q.   Nothing at all?
5    A.   No.
6    Q.   What company provided the phone
7    service for Morgan Funding?
8    A.   Off the top of my head, I don't
9    remember.
10   Q.   Would that be reflected in
11   records somewhere?
12   A.   Yes.
13   Q.   Did you pay the bills for Morgan
14   Funding?
15   A.   Yes.
16   Q.   You signed the checks?
17   A.   Yes.
18   Q.   You remember signing checks for
19   the phone company for phone service?
20   A.   I don't remember it, but I'm
21   sure I did.
22   Q.   Okay. But you don't remember
23   who it was?
24   A.   We probably had a couple of
25   different vendors over the years. We

Page 53

DANIEL MACKLE

1
2  switch every now and again.
3      Q.  Your checkbook should reflect
4  which company it was?
5      A.  Yes.
6          MR. LANGELAND:  We'd like to
7  call for the production of those.
8  Okay?
9          MR. GELBER:  Of what?
10         MR. LANGELAND:  Of the checks
11 that were paid to phone companies.
12         MR. GELBER:  Take it under
13 advisement.  I don't know.  Do you
14 have that?
15         THE WITNESS:  I have no idea.
16         MR. GELBER:  Were banks still
17 returning checks back then?  It
18 doesn't matter.  We'll take it under
19 advisement.
20     Q.  When did you move up to the
21 ninth floor?
22     A.  I'm not sure.
23     Q.  I'm sorry.  Let me strike that.
24         When did Morgan Funding move up
25 to the ninth floor?

Page 54

DANIEL MACKLE

1
2      A.  I'm not sure.
3      Q.  You said the second floor office
4  was open for a couple of years?
5      A.  I believe so, yes.
6      Q.  Okay.  And then Morgan Funding
7  moved to the ninth floor, it didn't move
8  somewhere else, right, in between?
9      A.  No.
10     Q.  It just moved up to the ninth
11 floor?
12     A.  Yes.
13     Q.  Okay.  So sometime in 2002 or
14 2003?
15     A.  It's possible.
16     Q.  Okay.  And where did your office
17 move?
18     A.  The 15th floor.
19     Q.  Okay.  So was that
20 simultaneously?
21     A.  Yes.
22     Q.  And Craig Colletta was in the --
23 I'm sorry.  Was Craig Colletta in the
24 office on the second floor with you at
25 some point?

Page 55

DANIEL MACKLE

1
2      A.  Yes.
3      Q.  Did he have his own office?
4      A.  No.  We shared an office.
5      Q.  Who else worked in that second
6  floor office with you?
7      A.  Of J.P. Turner or Morgan
8  Funding?
9      Q.  Anybody.
10     A.  In the actual private office or
11 on the -- I don't understand.
12     Q.  In the office, in the actual
13 private office.
14     A.  Nobody.
15     Q.  It was just you and Craig
16 Colletta?
17     A.  Yes.
18     Q.  Did you have a secretary?
19     A.  No, I don't believe we did, no.
20     Q.  Was it just one private office
21 or was there a waiting room or a reception
22 area?
23     A.  No, there was no waiting room.
24     Q.  Was there a reception area?
25     A.  Yes.  Oh, no, for the --

Page 56

DANIEL MACKLE

1
2  actually, no, there wasn't.
3      Q.  Okay.  And there was no
4  secretary or anybody there?
5      A.  No.
6      Q.  Was there any other executive in
7  the Journal Square location for Morgan
8  Funding during that time when the office
9  was on the second floor?
10     A.  No.
11     Q.  At that point, had you
12 established a computer network for Morgan
13 Funding?
14     A.  I don't think so.
15     Q.  Do you know when that was?
16     A.  I'm not sure.
17     Q.  Did you have an IT professional?
18     A.  Yes.
19     Q.  Who was it?
20     A.  Ian Royce.
21     Q.  And when did he become employed
22 by the company?
23     A.  I'm not sure.  We were on the
24 ninth floor already at that point.
25     Q.  And did he have an office in the

Page 57

1   DANIEL MACKLE
2   ninth floor?
3   A.   Yes.
4   Q.   He came to work every day?
5   A.   For the most part.
6   Q.   When did you establish your
7   e-mail string, the morganfundingcorp.com
8   e-mail?
9   A.   I don't know off the top of my
10  head.
11  Q.   Was it early on in the
12  corporation?
13  A.   I would think so, yes.
14  Q.   Do you have any requirements
15  from the banking department to keep any
16  records as a mortgage broker?
17  A.   Yes.
18  Q.   And what are the requirements?
19  A.   I'd have to refresh my memory.
20  Q.   What's your best recollection at
21  this point?
22  A.   I think three years or something
23  you have to keep the loan files.
24  Q.   And did you keep them for --
25  A.   Yes.

Page 58

1   DANIEL MACKLE
2   Q.   -- the period, as best you can
3   remember?
4   A.   Yes.
5   Q.   Okay.  From your office on the
6   second floor, could you see into Morgan
7   Funding's office?
8   A.   No.
9   Q.   What time did you arrive at your
10  office?
11  A.   Typically around 8:00 a.m.
12  Q.   Did you go straight into your
13  office or did you go into Morgan Funding?
14  A.   I don't remember.
15  Q.   I mean, was it your habit to,
16  you know, go in and check, have a meeting
17  or anything like that at Morgan Funding?
18  A.   No.
19  Q.   Was it more your habit just to
20  go to your office and start working on
21  whatever it was you were working on?
22  A.   There was nobody in Morgan
23  Funding at eight o'clock in the morning.
24  Q.   How do you know that?
25  A.   Because I had been in there.

Page 59

1   DANIEL MACKLE
2   None of those guys, they all came in late.
3   Q.   Did you check every day?
4   A.   No.
5   Q.   What time did the managers get
6   to work?
7        MR. GELBER:  Now, we're talking
8   about Morgan Funding?
9        MR. LANGELAND:  Morgan Funding
10  managers.
11       MR. GELBER:  Okay.
12  A.   By 10:00 usually.
13  Q.   And did all of the loan officers
14  arrive at exactly the same time?
15  A.   I don't know.  I doubt it.
16  Q.   Do you know whether some came
17  earlier and some came at different times?
18  A.   I don't know.
19  Q.   You have no knowledge as to when
20  any loan officer arrived at Morgan
21  Funding?
22  A.   I don't have any knowledge as to
23  what time, you know, whether they came in
24  together, no, I don't.
25  Q.   Okay.  Was there any system

Page 60

1   DANIEL MACKLE
2   where you locked people out of Morgan
3   until a particular time?  In other words,
4   were the doors locked until 10:00 a.m. and
5   then opened?
6   A.   Well, no.  I think the elevators
7   were locked, but I'm not sure about that.
8   Q.   Okay.  Would they be locked at,
9   say, 8:00 a.m.?
10  A.   Don't know.
11  Q.   You don't know what time the
12  elevators were locked or unlocked at 26
13  Journal Square?
14  A.   Yeah.
15  Q.   What time did you leave your
16  house?
17  A.   It varied.
18  Q.   Okay.  Was there a general time
19  when you would get on the road?
20  A.   6:00 or 7:00.
21  Q.   Okay.  And you were coming in
22  from Pomona every day?
23  A.   Yes.
24  Q.   And how long is that drive?
25  A.   About an hour.